691 So.2d 347 (1997)
STATE of Louisiana, Plaintiff-Appellee,
v.
Antonio BOSLEY, Defendant-Appellant.
No. 29253-KA.
Court of Appeal of Louisiana, Second Circuit.
April 2, 1997.
*348 Michael A. Courteau, Monroe, for Defendant-Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Stephen T. Sylvester, Assistant District Attorney, for Plaintiff-Appellee.
Before MARVIN, C.J., and HIGHTOWER and GASKINS, JJ.
MARVIN, Chief Judge.
Antonio Bosley, born in 1962, appeals his conviction by jury of aggravated rape of T.D., his stepdaughter, born August 20,1982, between the dates of July 1,1993 and August 19, 1994. La.R.S. 14:42 A (4). He assigns five errors, including the sufficiency of the evidence to convict.
Bosley's remaining assignments complain of the trial court's rulings on a challenge for cause of a juror; a motion for mistrial made when two witnesses referred to his being "locked up" or "incarcerated"; the admissibility of evidence of conduct which occurred after the victim's 12th birthday; and the allowance of "surprise" testimony by the victim's treating psychologist about her reaction to a recent telephone call from Bosley, as described to the doctor by the victim's mother during an office visit on January 12, 1996, only four days before the trial began. The state had furnished defense counsel with the doctor's written reports of his prior visits with the victim, the last of which had apparently occurred in November 1995, about two months before trial. The state did not inform defense counsel of the January 1996 visit, as to which no written report had yet been prepared, according to the doctor.
We affirm.

DISCUSSION

Sufficiency of Evidence to Convict (Assignment Four)
We first determine the sufficiency of the evidence as directed by State v. Hearold, 603 So.2d 731 (La.1992), applying the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Bosley and the victim's mother began dating in March 1993 and were married in August of that year, around the time of the victim's 11th birthday. Bosley began living with his future wife and her two children, T.D. and her younger sister, in July 1993, about a month before the marriage. Bosley's moving into the home apparently coincided with the family's move to the Oakmont Apartments in Monroe, where Bosley lived continuously with his wife and stepchildren until about May of 1994, when he left Mrs. Bosley for another woman. Mrs. Bosley initially desired a reconciliation with her husband, who occasionally returned to the apartment for brief periods of time over the next several months. By November of 1994, however, a few months after T.D.'s 12th birthday in August of that year, Bosley had "left for good," according to Mrs. Bosley. For at least some of the time between May and November 1994, Bosley was in jail for an unrelated offense.
T.D. was ten years old when her mother began dating Bosley in the spring of 1993. T.D. testified that Bosley began "touching her in wrong places" in what he described as a "tickling game" even before he moved into the family home in July 1993, about a month *349 before T.D.'s 11th birthday. After the move, Bosley's inappropriate behavior with T.D. continued and progressed to partially undressing her from the waist down, unzipping his pants, exposing his penis, and attempting, sometimes successfully, to insert his penis into her vagina. She described each act as painful, and as "stinging." She said Bosley threatened her with a knife because she said she did not want to "do it." He showed her her mother's gun, threatening to kill her if she told anybody. T.D. did not tell anyone because Bosley threatened to kill her mother and sister if she did. She explained that she sometimes cried when Bosley had sex with her.
Eventually, and after Bosley no longer resided in their home, T.D. told her mother in February 1995 of many instances in which Bosley committed such acts on her. She said she was not yet 12 when these incidents began.
T.D. withstood cross-examination, which questioned her credibility, her desire to reunite her estranged parents, and her having accused a Rev. Snider of similar acts. She was also cross-examined in detail about her observation of Bosley's lower torso and penis.
Jacqueline Bosley, the victim's mother, testified that Bosley last lived with her and her children, T.D. and O.F.D., in November 1994. Mrs. Bosley said that when T.D. learned that Bosley might not be returning home from jail, she told her about Bosley's conduct. Mrs. Bosley said she had earlier asked her daughters if they had been "bothered" by Bosley, and T.D. had then responded negatively. Mrs. Bosley said when she asked T.D. in February 1995, T.D. first answered negatively until she was told that she did not have to be afraid because Bosley would not return to the home. Once T.D. told her mother she had been molested, Mrs. Bosley informed the child's natural father, the Monroe Police Department and child protection authorities. T.D. underwent medical and psychological examinations. Mrs. Bosley testified that her daughter was a good student, active in school and extracurricular activities. She testified that at the outset of her relationship with Bosley, her daughters seemed to like him, and that she had trusted him.
A social services specialist for the Office of Community Services, Cassandra Brown, testified that she investigated Mrs. Bosley's complaint. A detective in the Monroe Police Department, Rita McCormick, testified that she received Cassandra Brown's report concerning T.D. and arranged for a medical examination of T.D. by Dr. Meade O'Boyle.
Dr. O'Boyle, a pediatric specialist in child abuse, testified that T.D. had scarring in her vagina consistent with the entry of a penis. The child's labia was noted to have the appearance of that of an adult female, which indicated repeated stimulation or fondling. Dr. O'Boyle's findings were consistent with the reported history given by T.D. The doctor concluded that T.D. had been penetrated during "full sexual intercourse."
Dr. David Thomason, the clinical psychologist who counseled T.D., testified that T.D. showed the clinical symptoms of post-traumatic stress disorder, which was consistent with the trauma of being raped. He also testified that T.D.'s condition suffered a setback when she answered a telephone call at her home from Bosley. The admissibility of this testimony is discussed in Assignment Five, infra.
For the defense, Dr. Claude K. Smith, the coroner, testified that he found Bosley to have a three-inch horizontal scar near his navel from an umbilical hernia repair and an uncircumcised penis of above average size. Dr. Smith acknowledged Bosley was capable of committing aggravated rape, explaining on redirect that he meant that Bosley's organs "were in working order."
Against the advice of counsel, and after indicating his understanding of his constitutional rights as explained to him by the trial court on the record outside the jury's presence, Bosley testified. Bosley said that he was 33, had a ninth grade education and had prior convictions for introducing contraband (marijuana cigarettes) into a penal institution and attempted simple burglary. He said he had never been convicted of any sex crime, denied having raped T.D., and explained that T.D. had "bitterness" toward him during his *350 relationship with her mother because she wanted her mother and biological father back together.
Bosley also testified that Mrs. Bosley told him he had "hurt" her by leaving her for another woman and she was going to "hurt him back" in any way she could, even if it meant that he would spend the rest of his life in jail.
On cross-examination, Bosley denied ever having any opportunity to rape T.D. He suggested that the findings of Dr. O'Boyle were caused by a "boy" her mother had caught T.D. with. He suggested that T.D. was "fast and sassy," implying perhaps that she was sexually active. Bosley suggested he did not need to have sex with children because he was a "ladies' man."
On rebuttal, Mrs. Bosley testified to Bosley's work history, that he was not continuously employed, and specifically that Bosley had been alone with T.D. and her other daughter on several occasions.
Under the Jackson v. Virginia standard, we review the record in the light most favorable to support the verdict to determine whether the evidence was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied.
La.R.S. 14:41 defines the crime of rape:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
An aggravated rape includes, among other conduct defined in La.R.S. 14:42 A(1)-(5), a rape committed when the victim is under the age of 12. § 42 A(4). Bosley was charged by grand jury indictment with one count of aggravated rape, in violation of § 42 A(4), making T.D.'s age at the time of the offense an essential element of the state's case, along with Bosley's identity as the offender.
As to the latter issue, the jury obviously accepted the testimony of the state's witnesses and not that of Bosley and his witnesses. As to the former, it is undisputed that Bosley became involved with T.D.'s mother in the spring of 1993, when T.D. was only ten years old, and lived in the family home with T.D. from July 1993 until at least May 1994, a few months before T.D.'s 12th birthday in August. Bosley's insistence that he last lived with his wife in May 1994, and not in November of that year as T.D. and her mother testified, bolsters the conclusion that his sexual abuse of T.D. occurred before she reached age 12. Notwithstanding that the bill of indictment charged Bosley with having committed the offense "between 01 Jul 1993 and 31 Oct 1994," the latter date being about two months after T.D.'s 12th birthday, the jury was instructed that to find Bosley "guilty as charged, you must find that between July 1, 1993 and August 19, 1994 [the day before T.D.'s 12th birthday], the defendant did commit aggravated rape of [T.D.]" Our brackets.
In reviewing the evidence for sufficiency to convict, this court must accept the jury's credibility calls and inferences drawn from conflicting evidence when those determinations are reasonably supported by the record. We do not second-guess the jury's resolution of the factual conflicts, but consider only whether the evidence deemed credible by the jury is legally sufficient to establish each essential element of the offense beyond a reasonable doubt. State v. Baker, 28,152 (La.App.2d Cir. 5/8/96), 674 So.2d 1108; State v. Grant, 623 So.2d 204 (La.App. 2d Cir.1993), writ denied; State v. Jenkins, 456 So.2d 174 (La.App. 2d Cir.1984), writ denied.
The jury here was presented with a classic credibility contest. The jury's resolution of the factual conflicts in the state's favor is reasonable on this record. The evidence credited by the jury sufficiently establishes each essential element of the offense, including the victim's age at the time of the offense and Bosley's identity as the offender. The evidence is legally sufficient to convince a rational fact finder beyond a reasonable doubt that Bosley committed the aggravated *351 rape of T.D. before August 20,1994, her 12th birthday.

Challenge for Cause (Assignment One)
Bosley's counsel preserved this assignment after he exhausted his peremptory challenges and the jurors were seated, contending that the court erred in denying his challenge for cause of Ms. Modicue, who had asserted on voir dire that she would "lose" money by serving on the jury because she would not be able to work. Responding to counsel's complaint, the court stated that its questioning of Ms. Modicue revealed "that she would hold to the principles of law that are central to [a] fair trial[,] ... that there was no reason to believe she [would] lose her job ... [and while] it appeared [she was] probably legitimate in not wanting to lose that money [$1,000 a week], that did not amount to a challenge for cause under the statute [La.C.Cr.P. art. 797] and therefore it was denied." Our brackets.
Bosley did not thereafter object to the trial court's ruling to preserve the issue for appellate review, as mandated by La.C.Cr.P. art. 800. Even should we consider the merits of the assignment, however, we find no error or abuse of the trial court's discretion in denying the challenge for cause of this juror. See State v. Hattaway, 28,060 (La.App. 2d Cir. 5/8/96), 674 So.2d 380.

Denial of Mistrial (Assignment Two)
Two witnesses, Mrs. Bosley and Dr. David Thomason, mentioned in their testimony that Bosley was in jail at various times after he moved out of the family home in 1994. Mrs. Bosley referred to Bosley being "locked up" in February 1995, when T.D. first told her mother of Bosley's abuse. Dr. Thomason said "... she [T.D.] was afraid he [Bosley] was not incarcerated any longer..." in January 1996, when Bosley telephoned T.D.'s mother and T.D. answered the phone.
Although urged by the defense during trial to be the erroneous admission of other crimes evidence under La.C.Cr.P. art. 770, the assignment relates to mistrial under La. C.Cr.P. art. 771. Art. 770 governs references to other crimes made by the judge, the district attorney or a court official, not by witnesses. Art. 771 governs such remarks made by "a witness or person other than the judge, district attorney, or a court official" and requires only an admonition unless the prejudice arising from the remark cannot be cured by admonition. The trial court gave the admonition in each instance.
[A] statement, made by a state witness and not the district attorney, does not mandate a mistrial under La.C.Cr.P. art. 770(2). Ordering a mistrial is therefore discretionary. La.C.Cr.P. art. 771(2). Factors the court may consider in determining whether a mistrial is warranted are whether the statement was (1) deliberately elicited by the district attorney, (2) responsive to the question, and (3) uttered by the witness to prejudice the defendant.

State v. Williams, 26,655, p. 5 (La. App. 2d Cir. 3/1/95), 651 So.2d 331, 334, writ denied [660 So.2d 448]. Citations omitted.
The remark made by Mrs. Bosley was neither solicited by the prosecutor nor responsive to his question:
Q. Did [T.D.] give you any indication that anything had happened between she [sic] and Mr. Bosley?
A. Yes, she did. I was sitting in the kitchen once.
Q. Just a second, Mrs. Bosley. Was thisWhen did she give you this indication?
A. Well, she thought he was coming, you know, home. He wasHe was, you know, locked up.
Q. Okay. When did sheWhat month?
A. What month?
Q. Yes, ma'am. Do you recall?
The prosecutor was obviously seeking a chronological date as to when T.D. first told her mother of the abuse. The witness essentially answered why T.D. finally admitted the abuse after having denied it to her mother twice before. Bosley was clearly not prejudiced by this unsolicited and unresponsive "other crimes" evidence, as he admitted to the jury that he had spent time in jail for other offenses both before and after he resided *352 with T.D.'s mother. One of his prior felony convictions was for bringing marijuana cigarettes into a jailhouse in the 1980s. Bosley testified that he had just gotten out of jail when he began dating T.D.'s mother in March of 1993. He said he was incarcerated again from May 1994-February 1995.
Dr. Thomason's reference to Bosley's incarceration arose in the context of the doctor's testimony that T.D. had initially been "more than willing to talk and establish rapport" with him, but that he noticed a change in her appearance and demeanor during her last counseling session on January 12,1996:
Q. [D]id she appear different to you in that session?
A. Yes, she did.
Q. [I]n what ways ... was her appearance different?
A. [S]he was very quiet, ... withdrawn, kind of curled up on the couch and wouldn't look at me, looked very scared.... I [asked her] what [was] going on ... and she wouldn't answer me. So I asked her mother to tell me what was happening with her.... [H]er mother related to me that she [T.D.] had answered the phone on or about January the second and that Mr. Bosley was on the phone and had called and asked to speak with Jackie Bosley, the mother. And that [T.D.] hung up the phone, but that it really bothered her a lot. And she was afraid that he was not incarcerated any longer, and was afraid that he might come harm her in some way [for having reported the abuse].

Our emphasis and brackets.
The doctor later testified that the changes he observed in T.D.'s behavior were consistent with his diagnosis of post-traumatic stress disorder. He did not express any opinion as to whether T.D.'s reaction to Bosley's phone call was consistent with Bosley having been the perpetrator of the trauma.
Again, the witness's reference to Bosley's incarceration arose in an answer that went beyond the scope of the prosecutor's question. Dr. Thomason essentially explained why T.D. behaved differently during the last counseling session when the prosecutor had simply asked him how her appearance differed from prior sessions. Though the state clearly intended to elicit evidence that T.D. was upset by Bosley's recent phone call, the prosecutor's questions cannot be reasonably construed as having asked or invited the witness to disclose Bosley's whereabouts when he made the call. Any arguable prejudice that may have resulted from Dr. Thomason's reference to Bosley's incarceration was negated when Bosley admitted to the jury that he had been in jail several times.

Discovery Violation (Assignment Five)
Bosley also objected to Dr. Thomason's testimony about T.D.'s recent psychological setback on another ground, the state's failure to furnish Bosley's counsel with a copy of Dr. Thomason's report of the January 12, 1996, office visit. As mentioned, that visit took place only four days before the trial began. The prosecutor, Ms. Liles, and the defense lawyer, Mr. Courteau, agreed that Mr. Courteau had "overheard" Ms. Liles' conversation with Dr. Thomason before court began that day, in which the doctor explained that his report of the January 12 visit had not yet been transcribed and Ms. Liles told the doctor that she "was planning to have him testify to it on the stand." The court allowed Mr. Courteau to confer with Dr. Thomason in private before he took the stand, and the state agreed not to ask Dr. Thomason whether T.D.'s setback after Bosley's phone call was consistent with Bosley having been the perpetrator of the traumatic event which triggered her post-traumatic stress disorder.
Bosley's counsel then objected that he did not have an opportunity "to bring in [another] expert [witness] to rebut what [Dr. Thomason] may say." The court overruled this objection as well, stating, "if the defense wanted an expert psychologist and had filed a motion requesting one with any colorable justification given the serious nature of the case, the court would have granted such an order." Noting that the defense had written reports of Dr. Thomason's earlier visits with T.D., and had not requested a defense expert to counter or rebut Dr. Thomason's testimony *353 in any other respect, the court overruled the objection.
Bosley now reasserts his claims of surprise, prejudicial impact of the undisclosed evidence and an inability to adequately prepare a defense or obtain expert testimony in rebuttal. Again the issue is mistrial.
Mistrial is a drastic remedy which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. Failure to comply with discovery merits mistrial only when the State's conduct substantially affects the defendant's right to prepare a defense. Exclusion of the undisclosed evidence is sometimes an appropriate remedy.... However, it is not warranted unless there is substantial prejudice to the defendant. Such prejudice could consist of surprise or a showing that the undisclosed evidence would have changed the defense strategy. Trial courts may offset the effect of late disclosure by calling a recess or granting a continuance. The trial court has wide discretion in fashioning a remedy. The propriety of the remedy depends on the circumstances of the case.

State v. Hooker, 623 So.2d 178, 182 (La.App. 2d Cir.1993). Citations omitted.
The trial court concluded that a recess and allowing defense counsel to interview the doctor, combined with a limitation on what testimony could be elicited from Dr. Thomason, was adequate to obviate any claimed prejudice, notwithstanding Bosley's claim that the late discovery denied him the right to adequately prepare for trial or to obtain expert testimony on his behalf. As the trial court indicated, if Bosley had requested the appointment of an expert witness to assist in his defense, the trial court would likely have granted the request. No request was made, however. Other testimony by Dr. Thomason about the effect of Bosley's words and conduct on T.D. was similar and did not cause Bosley to seek expert testimony for his defense. Moreover, Bosley's counsel effectively cross-examined Dr. Thomason, who acknowledged the "possibility" that the child's reaction to the call could have resulted from her having lied in accusing Bosley, as opposed to it being consistent with post-traumatic stress disorder. Dr. Thomason recognized that possibility, but said it was not one he had considered.
Agreeing with the trial court on this record, we find no prejudice to Bosley in this claimed violation of discovery. Any assumed error is harmless in light of the other testimony by Dr. Thomason and T.D. and her mother.

Conduct Occurring After T.D.'s 12th Birthday (Assignment Three)
As mentioned above, the bill of information charged Bosley with having committed the offense between July 1, 1993 and October 31, 1994, the latter date being a few months after T.D.'s 12th birthday on August 20. Bosley filed a motion in limine seeking to exclude evidence of any conduct which occurred after T.D.'s 12th birthday. The court denied the motion but expressed its willingness to reconsider the issue during trial in light of the reason for which the testimony was being offered. Bosley did not object to any trial testimony on this basis, and the jury was instructed to consider only conduct occurring before August 20, 1994 in order to convict.
Bosley testified that he last lived with T.D. and her mother in May 1994, while they placed his final departure in November. Bosley now argues that the testimony of T.D. and her mother implying that he may have sexually abused T.D. after she turned 12 in August 1994 was inadmissible "other crimes" evidence. He did not move for a mistrial or make a contemporaneous objection during the trial, however, which would have allowed the trial court to reconsider its earlier ruling on his motion in limine and to admonish the jury if necessary. Having failed to object at trial, he cannot now raise the issue on appeal. La.C.Cr.P. arts. 771, 841; State v. Barrett, 350 So.2d 664 (La.1977); State v. Matthews, 26,550 (La.App. 2d Cir. 12/21/94), 649 So.2d 1022, writ denied.

DECREE
The conviction is AFFIRMED.
*354 HIGHTOWER, J., concurs with written reasons, but does not reach the sufficiency issue.
HIGHTOWER, Judge, concurring.
Although concurring in the result, I do not reach the evidence-sufficiency complaintan issue not properly before us after the defendant failed to present a post-trial motion for acquittal to the district court. See La. C.Cr.P. art. 821; State v. Hall, 624 So.2d 927 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1182 (La.1993); Bates v. Blackburn, 805 F.2d 569 (5th Cir.1986), cert. denied, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). See also discussion in concurrence to State v. Green, 28,994 (La.App. 2d Cir. 02/26/97), 691 So.2d 1273, and authorities therein.